1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ERIC KENNETH DUNGAN,

11              Petitioner,                  No. CIV S-10-1191 DAD P

12        vs.

13   RON BARNES, Warden,                     ORDER

14              Respondent.

15   _____/

16              Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Therein petitioner challenges the judgment of conviction

18   entered against him in the Placer County Superior Court in 2007 for second-degree murder in

19   violation of Cal. Penal Code § 187(a), upon which he was sentenced to a term of fifteen years to

20   life in state prison.  Petitioner seeks federal habeas relief on the grounds that: (1) there was

21   insufficient evidence introduced at trial to support his murder conviction; and (2) the trial court's

22   jury instruction on the mental state required for murder was erroneous, violating his right to due

23   /////

24   /////

25   /////

26   /////

1

1  process.[1]  Petitioner also seeks an evidentiary hearing in this court on his insufficiency of the

2  evidence claim on the grounds that the DVDs of his police interrogation were not provided to his

3  appellate counsel.  Both parties have consented to Magistrate Judge jurisdiction over this action

4  pursuant to 28 U.S.C. § 636(c).  (Doc. Nos. 8, 11.)

5         Upon careful consideration of the record and the applicable law, the undersigned

6  concludes that petitioner is not entitled to federal habeas relief and that his request for an

7  evidentiary hearing must be denied.

8                              PROCEDURAL BACKGROUND

9         On March 13, 2007, a Placer County Superior Court jury found petitioner guilty

10 of murder in the second degree, in violation of California Penal Code § 187(a), and gross

11 vehicular manslaughter while intoxicated, in violation of California Penal Code § 191.5(a),

12 enhanced by an allegation that he fled the scene after committing that offense, in violation of

13 California Vehicle Code § 20001(c).  (Lod. Doc. 1, Clerk's Transcript on Appeal (hereinafter

14 "CT") at 514-517.)  On April 26, 2007, petitioner was sentenced to fifteen years to life in state

15 prison for murder, with a concurrent term of eleven years in state prison for manslaughter.  (Id. at

16 675-678.)

17        Petitioner appealed his murder conviction to the California Court of Appeal for

18 the Third Appellate District.  (Lod. Doc. 4.)  On April 1, 2009, the state appellate court affirmed

19 /////

20

21        [1]  The petition also alleges in his pending petition that the state trial court erred by
   denying his motion for a judgment of acquittal pursuant to California Penal Code § 1118.1.
22 (Petition (hereinafter "Pet.") at 5.)  Respondent argues in his answer that petitioner did not
   exhaust this claim in state court as required. (Answer at 15-16.)  In his traverse, petitioner
23 concedes that this claim is unexhausted and requests that the court "instead rule on the other
   claims."  (Traverse at 14.)  In light of petitioner's specific request that the court proceed in this
24 action on his exhausted claims, the court will dismiss petitioner's claim that the state court erred
   in denying his motion for judgment of acquittal due to his failure to exhaust that claim by
25 presenting it to the state high court.  See Solis v. McDonald, No. CIV S-10-0637 FCD DAD P,
   2010 WL 3033800 (E.D. Cal. July 30, 2010) (setting forth petitioner's options, including
26 dismissal of unexhausted claims, when proceeding with a mixed petition in federal court).

1  the judgment in a reasoned opinion.  (Lod. Doc. 8[2].)  Petitioner then filed a petition for review

2  with the California Supreme Court and on June 10, 2009, the court summarily denied that

3  petition.  (Lod. Docs. 7 & 9.)

4          On May 17, 2010, petitioner filed his federal habeas petition in the instant case.

5  (Doc. No. 1.)  On August 2, 2010, pursuant to court order dated June 2, 2010 (Doc. No. 5),

6  respondent filed an answer.  (Doc. No. 13.)  On August 26, 2010, petitioner filed a traverse, in

7  which he requested an evidentiary hearing on his insufficiency of the evidence claim.  (Doc. No.

8  15.)

9                              FACTUAL BACKGROUND

10         In its unpublished memorandum and opinion affirming petitioner's judgment of

11  conviction on appeal, the California Court of Appeal for the Third Appellate District provided

12  the following factual summary:

13             Rocklin Police Officer Matthew John Redding was on duty,
               diverting traffic away from high-risk felony stops being performed
14             by a number of patrol vehicles.  Defendant, who had been drinking
               all night, had been told minutes before that he was too drunk to
15             drive, and who was looking at his mobile phone to send a
               text-message, ran Officer Redding down with his pickup truck,
16             killing Officer Redding.

17                                   * * *

18             BACKGROUND

19             People's Case

20             While defendant had been an airman at Beale Air Force Base, he
               had been present at briefings that emphasized the dangers of
21             drinking and driving (DUI), among other topics.  His former group
               commander testified there were monthly "commander's calls" at
22             which the subject of drunk driving was always brought up, and
               there were also weekly DUI briefings for airmen under 26, where
23             participants would sign a "Weekly Safety Briefing/[DUI] Sign-In

24  _____

25      [2]  The cover sheets to Lodged Documents No. 7 and 8 as they appear in the court's record
    as lodged by respondent should be switched: Lodged Document 7 is Appellant's Petition for
26  Review and Lodged Document 8 is the Opinion of the California Court of Appeal for the Third
    Appellate District.

Log ."  The commander identified defendant's signature on one such log sheet, but did not know exactly what was said at that particular briefing.

Defendant drank at three different places on the night of October 8-9, 2005.

First, at TGI Friday's, around 9 to 10 p.m., defendant joined a party celebrating the birthday of a friend/coworker of defendant's.

Second, defendant stayed with the party as it moved about 10:30 to 11:30 p.m. to the West House.  A witness who arrived around midnight testified defendant was staggering drunk, and had been dancing suggestively with the witness's girlfriend.

Third, defendant stayed with the group as it moved around closing time to a private home in Granite Bay.  A woman took a bottle of tequila away from him because he had had too much to drink; he was staggering drunk.  Eventually, because he was pestering another women and groped her breast, she called a taxi cab company so that defendant would go home.

The cab driver received the call about 3:30 a.m., and it took only about 10 to 15 minutes to get to the house.  Defendant first asked him to drive to the West House, but on the way defendant changed the destination to TGI Friday's.  From the way defendant acted, the cab driver thought he might not be well.  They arrived at TGI Friday's but defendant's truck was not there, so defendant told the cab driver to go to the West House.  The cab driver kept talking to defendant because he was afraid defendant would fall asleep.  After they found defendant's truck at the West House, the cab driver warned defendant that he was too drunk to drive and he should sleep in his truck.  Defendant asked the driver whether the driver had defendant's keys.  About 4:00 a.m., after paying the cab fare with a credit card, defendant drove off.  Based on his cab driving experience, he rated defendant "right around eight" on a scale of 1 to 10 for drunkenness.

While defendant was partying, Rocklin Police Officer Matthew Redding was on duty.  He was assisting other officers who were performing a highly dangerous job.  At the time, the Sacramento County sheriff provided contract police services to the City of Citrus Heights.  As two Citrus Heights officers were following a car in response to a complaint of an armed man making threats, they became concerned when they realized other cars were following them.  Eventually, there were three or possibly four suspect cars that had to be stopped and searched, and between 8 to 12 patrol cars, all with overhead light bars flashing, managed to coordinate multiple felony stops on Highway 65, just north of the Galleria Boulevard overcrossing, a "very well lit area."  Because of the danger, Highway 65 was blocked off.

4

Officer Redding parked his patrol car, with overhead light bar flashing, just before the Galleria/Stanford Ranch exit ramp, and set up a series of reflective hazard cones, to divert traffic off Highway 65. He stood facing traffic and motioning with a bright flashlight.

Defendant was driving about 55 to 60 miles per hour north on Highway 65. He did not slow down at the sight of the 8 to 12 police cars with flashing lights or for the flashing lights of Officer Redding's car, although lights were visible for "about 1500 feet" south of where the car was parked. Another officer estimated the lights of the cars at the felony stop could be seen about 2000 feet away. One witness testified the "glow of the lights" was visible from the exit ramp from Interstate 80, and she saw a patrol car "in the middle of the road" and Officer Redding standing in front of it with a flashlight, motioning traffic off the highway at the Stanford Ranch exit. Two officers testified there was "a Christmas tree of police lights" visible to a motorist. Defendant did not slow down for the line of hazard cones leading traffic to the exit ramp. They were apparently so brightly reflective that one witness thought they had been flares. Defendant did not slow for Officer Redding – who stood 6'2", nor did he stop for his flashlight signals. Instead, defendant drove around another car that had slowed down "real briefly" and drove directly into Officer Redding. Immediately, a witness estimated defendant was still driving at "probably fifty" miles per hour.

Officers at the multiple felony stop, which had been winding down, heard a noise and then horrible screaming coming from the south. Officers saw defendant's truck, with one headlight out and obvious damage, leave the freeway (after drifting onto the dirt or gravel shoulder) and they realized what may have happened, although they did not know the severity of the incident. Defendant was staring "straight ahead," as he passed the officers, which can be a sign of intoxication.

Patrol cars began following defendant and signaled him to pull over. Although defendant had three opportunities to pull into a shopping center parking lot, and appeared to slow down for each of those chances, he kept driving until he reached Roseville Parkway, where he turned right and finally pulled over about 4:11 to 4:12 a.m. It was about half a mile between where officers caught up to defendant and where defendant finally pulled over.

Defendant's eyes were bloodshot and glassy, he smelled of alcohol, and he continued to stare straight ahead. As defendant fumbled for identification, the officers learned that Officer Redding "was down" and they handcuffed defendant and put him in a patrol car. An ambulance on its way to the hospital passed the scene of the stop.

/////

Defendant was taken to the Roseville jail.  By the time he reached the jail the arresting officers had learned Officer Redding was dead.  Defendant failed various field sobriety tests at the jail. When initially questioned about half an hour at the jail by CHP Officers Andrew Mayo and Barry Larson, defendant repeatedly claimed he thought he had hit a dog or a bird and once said he hit a traffic cone.  He claimed he stopped drinking about 10:30 that night.  He said he was sending a text message on his phone when he looked up, saw flashing lights and heard a bang.

Beginning about 7:45 that morning, CHP Officer Charles Swift interviewed defendant for two hours and 45 minutes.  This interview, played for the jury on two DVDs, exhibit Nos. 454 and 455, revealed significant information about defendant's mental state.  However, no transcript of the interrogation was introduced into evidence, nor was any informal transcript included in the record on appeal, although some kind of transcript was passed out to the jurors.  It appears that neither appointed appellate counsel nor the Deputy Attorney General assigned to this case viewed these DVDs, therefore neither brief accurately portrays the evidence that was before the jury.

From references to these DVDs in the reporter's transcript, the parties could glean the following:  Defendant claimed he thought he had hit a dog or cone, and held to that story for about two and a half hours, but then admitted that he had seen Officer Redding, and that he knew he had hit a police officer facing his truck.  Defendant had been looking down at his mobile phone, preparing to send a text message; "I look up.  There is the officer right there."  He claimed he had only four drinks that night, two at TGI Friday's and two at the West House.  He also said that he had been wearing earplugs from an iPod and had been listening to music at the time.

But the DVD recordings of Officer Swift's interview with defendant reveal much more.  Defendant told Officer Swift that he had a drinking problem, that he drank once a month, inferentially to excess, and he had driven home much drunker than he was on the night in question.  He had been in a multi-car collision caused by a driver who was either drunk or on drugs, and a friend of a friend had been killed while driving drunk.  He had attended "hundreds" of the Air Force briefings, and the Air Force taught him that a DUI would wreck his career in the military, it was a "big deal."  The air base had a board near the exit listing the number of DUIs in the squadron, as a caution to airmen leaving the base, and defendant had to sign a weekly statement that he understood the risks of drunk driving.  Every weekend he had to attend briefings about the dangers of DUIs, and the Air Force taught him to have a "plan" in case of drinking; in fact, he knew one of the women in the party group was the "designated driver," and although she testified at trial that she drank a beer, defendant's statement shows his awareness of the purpose and need for a sober driver.  He knew

6

driving drunk impaired one's abilities and knew it could cause death if there was an accident.  He knew that he was supposed to stop at the scene of an accident, but he left the highway to avoid the patrol cars.  He thought that if stopped he would "blow over," that is, register at above the legal alcohol limit, but he still thought he was "fine" to drive because he had driven "worse than that" before, "way more drunk," and it was a "straight freeway shot" home on Highway 65, it was not a "big deal."  He later said he thought he was in the "range" of the legal limit, but "You never know what you're gonna blow" so he was not sure he would get a DUI.  He settled into his usual routine of texting with his right hand while steering with his left, and had his iPod turned up loud, with earphones in both ears.  He drove by using his peripheral vision, as he looked down to text.  At one point he said he was "juggling" the phone and the iPod as he manually shifted gears, and he would "casually" look at the road while texting.  He had been up nearly 24 hours and "hope[ed]" he would remember if he nodded off while driving, which has happened to him only on long trips and had not happened recently.

Defendant was released after posting bail and later made a statement to a television news reporter claiming he thought he hit a sign or a cone, in contrast to his admission to Officer Swift that he knew he had hit Officer Redding.

Defendant's blood sample taken at 5:45 a.m., showed a blood alcohol content of .15 percent.  In response to a hypothetical based on defendant's weight and supposed drinking pattern, an expert calculated that his blood alcohol level would have been at between .17 and .19 percent at 4:07 a.m. (just over twice the legal "limit" of .08 percent), and he would have had to drink about 15 drinks that night.

A woman testified defendant called her on her mobile phone about 4:05 a.m. that morning, sounding drunk.  Officer Redding suffered massive injuries, consistent with being hit by defendant's truck at 50 to 55 miles per hour, and died within half an hour.

There were no mechanical problems with defendant's truck and the weather was clear.  The felony stop was about 200 feet north of the overcrossing and Officer Redding's patrol car was about 1400 feet south.  A CHP accident reconstruction expert testified that, assuming he were traveling 50 miles per hour, defendant would have had 21 seconds to react to the patrol car lights, 15 seconds to react to the reflective cones, 14 seconds to react to Officer Redding's flashlight and 6 seconds to react to Officer Redding standing in the roadway, based on an accepted reaction time of one and a half seconds.

Defendant testified in his own defense.  We do not rely on his testimony in affirming the conviction.  Briefly, he claimed he saw

the lights of the patrol cars and mistook them for construction
lights. While listening to his iPod and sending a text message to a
woman, he changed lanes and felt a bump but did not know what
he had hit because he had been looking down at his phone.

Verdicts

In addition to finding defendant guilty of second degree murder
and gross vehicular manslaughter, the jury also returned a guilty
verdict on a lesser included count of ordinary vehicular
manslaughter, but the trial court treated it as a nullity. The jury
also returned special findings that defendant had been "advised" by
the cab driver "that he was too intoxicated to drive," and that he
did not tell anyone that Officer Redding was in need of assistance,
despite a reasonable chance to do so; however, the jury found not
true an allegation that defendant was not remorseful.

(Lod. Doc. 8 at 1-10.)

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a

judgment of a state court can be granted only for violations of the Constitution or laws of the

United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the

interpretation or application of state law. See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct.

13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146,

1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal

habeas corpus relief:

An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court shall
not be granted with respect to any claim that was adjudicated on
the merits in State court proceedings unless the adjudication of the
claim -

(1) resulted in a decision that was contrary to, or involved
an unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

/////

8

1          (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
2          State court proceeding.

3           For purposes of applying § 2254(d)(1), "clearly established federal law" consists

4  of holdings of the United States Supreme Court at the time of the state court decision.  Stanley v.

5  Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06

6  (2000).  Nonetheless, "circuit court precedent may be persuasive in determining what law is

7  clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at

8  859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010).

9           A state court decision is "contrary to" clearly established federal law if it applies a

10  rule contradicting a holding of the Supreme Court or reaches a result different from Supreme

11  Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640

12  (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may

13  grant the writ if the state court identifies the correct governing legal principle from the Supreme

14  Court's decisions, but unreasonably applies that legal principle to the facts of the petitioner's

15  case.[3]  Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra,

16  360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ

17  simply because that court concludes in its independent judgment that the relevant state-court

18  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

19  application must also be unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v.

20  Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal

21  habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

22  the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

23  precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

24

25      [3]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
presented in the state court proceeding."  Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011)
26  (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

1   the state court's decision." Harrington v. Richter, 562 U.S.___, ___,131 S. Ct. 770, 786 (2011)

2   (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for

3   obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

4   ruling on the claim being presented in federal court was so lacking in justification that there was

5   an error well understood and comprehended in existing law beyond any possibility for fairminded

6   disagreement." Harrington,131 S. Ct. at 786-87.

7           If the state court's decision does not meet the criteria set forth in § 2254(d), a

8   reviewing court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v.

9   Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th

10  Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because

11  of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

12  considering de novo the constitutional issues raised.").

13          The federal habeas court looks to the last reasoned state court decision as the basis

14  for the state court judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055

15  (9th Cir. 2004).  If the last reasoned state court decision adopts or substantially incorporates the

16  reasoning from a previous state court decision, this court may consider both decisions to

17  ascertain the reasoning of the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.

18  2007) (en banc).  "When a federal claim has been presented to a state court and the state court

19  has denied relief, it may be presumed that the state court adjudicated the claim on the merits in

20  the absence of any indication or state-law procedural principles to the contrary." Harrington, 131

21  S. Ct. at 784-85.  This presumption may be overcome by a showing "there is reason to think

22  some other explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v.

23  Nunnemaker, 501 U.S. 797, 803 (1991)).  Where the state court reaches a decision on the merits

24  but provides no reasoning to support its conclusion, a federal habeas court independently reviews

25  the record to determine whether habeas corpus relief is available under § 2254(d).  Stanley, 633

26  F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of

10

1   the record is not de novo review of the constitutional issue, but rather, the only method by which

2   we can determine whether a silent state court decision is objectively unreasonable." Himes, 336

3   F.3d at 853.  Where no reasoned decision is available, the habeas petitioner still has the burden of

4   "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S. Ct.

5   at 784.

6           When it is clear, however, that a state court has not reached the merits of a

7   petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a

8   federal habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v.

9   Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.

10  2003).

11          With these standards in mind, the court turns to address each of petitioner's

12  claims below.

13  II.  Insufficiency of the Evidence

14      A.  Arguments of the Parties

15          Petitioner argues that his second degree murder conviction should be reversed

16  because the evidence introduced at his trial was insufficient to support a murder conviction under

17  the decision in People v. Watson, 30 Cal. 3d 290 (1981).  In Watson, the California Supreme

18  Court held that implied malice, second degree murder may be based on the theory that the

19  defendant performed an act which involves the "high probability of death" with conscious

20  disregard of its consequences.[4]  30 Cal. 3d at 300-01.  Petitioner argues that, given his lack of

21  prior arrests for driving under the influence; the unexpected circumstances he encountered on the

22  night of the crash (i.e., "a roadblock consist[ing] of a single police patrol vehicle . . . in a zone

23

24          [4]  In 1983 the California Legislature adopted the "high probability of death" standard for
    implied malice announced in Watson when it adopted California Penal Code § 192, which
25  provides, in part: "Gross negligence, as used in this section, shall not be construed as prohibiting
    or precluding a charge of murder under Section 188 upon facts exhibiting wantonness and a
    conscious disregard for life to support a finding of implied malice, or upon facts showing malice,
26  consistent with the holding of the California Supreme Court in [Watson]."

11

1   with a posted speed of 65 miles per hour”); and the absence of prior “events to put him on notice

2   that he was not in proper condition to drive,” that the evidence “at best” supported a conviction

3   for gross vehicular manslaughter under California law.  (Pet. at 21-22; Traverse at 11.)  To the

4   extent the California Court of Appeal upheld his second degree murder conviction based on his

5   text-messaging at the time of the crash, petitioner asserts that “the dangers of texting were not

6   widely known in 2005” and thus the evidence failed to establish that he had a “subjective

7   awareness of the risk created” as required under the <u>Watson</u> implied malice standard.  (Traverse

8   at 9; <u>see also</u> 30 Cal.3d at 298.)  Petitioner asserts that he “has found no case in which such

9   moderate facts have been found to support a conviction of second degree murder.”  (Pet. at 22.)

10   Petitioner argues that his second degree murder conviction under the theory approved by the

11   California Supreme Court in <u>Watson</u> was erroneous, unsupported by the evidence and in

12   violation of his constitutional right to due process under <u>Jackson v. Virginia</u>, 443 U.S. 307

13   (1979).  (Traverse at 1.)

14           Respondent asserts that petitioner’s claim “amounts to an argument that the Court

15   of Appeal misconstrued California law,” which is unavailing on federal habeas review.

16   Respondent further asserts that petitioner has failed to establish that the state appellate court’s

17   application of <u>Jackson</u> was objectively unreasonable and that the state court’s decision therefore

18   must be upheld under AEDPA.  (Answer at 14-15.)

19           B.  <u>State Court’s Opinion</u>

20           The California Court of Appeal rejected petitioner’s claim that the evidence

21   introduced at his trial was insufficient to support his conviction for second-degree murder under

22   a <u>Watson</u> theory of liability, reasoning as follows:

23           Defendant contends the People did not introduce substantial
         evidence to support the murder charge and therefore the trial court
24           should have granted his motion for an acquittal at the close of the
         People’s case-in-chief; he also contends that the murder verdict
25           must be overturned for lack of evidence.

26   /////

Viewing the facts in the light most favorable to the jury verdict, as we must (People v. Johnson (1980) 26 Cal.3d 557, 576-578), we find substantial evidence of murder without reference to defendant's testimony.  Therefore we can resolve both of defendant's evidentiary claims by reference to the evidence in the People's case-in-chief.  As defendant impliedly notes, this method of review would defeat both claims.  (See, e.g., People v. Stevens (2007) 41 Cal.4th 182, 200; People v. Smith (1998) 64 Cal.App.4th 1458, 1464.)

Although many drunk driving death cases are properly deemed to constitute vehicular manslaughter, the California Supreme Court has held that "when the conduct in question can be characterized as a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied.  (§ 188.)  In such cases, a murder charge is appropriate."
([People v.] Watson [(1981) 30 Cal. 3d 290,] 298.)

Watson is read "as deliberately declining to prescribe a formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach."  (People v. Olivas (1985) 172 Cal.App .3d 984, 989 (Olivas ).)

The Courts of Appeal "have relied on some or all of the following factors in upholding such [murder] convictions: (1) blood alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (People v. Autry (1995) 37 Cal.App.4th 351, 358; see People v. Talamantes (1992) 11 Cal.App.4th 968, 973.)

All four of these factors are present in this case.  Defendant's blood alcohol was just over twice the legal limit.  Defendant had parked his car at one drinking location and joined a party that drank throughout the night, expecting to drive home.  He had actual knowledge about the hazards of drunk driving, but he drank monthly and drove "way more" drunk than he was that night, showing he disregarded all of his training.  He drove at highway speed by using his "peripheral" vision while his attention was on sending a text message, and while driving in such manner failed to see or heed obvious warnings.

Defendant claims the evidence did not establish the nature or frequency of the briefings he received.  Although more evidence about these briefings was introduced during cross-examination of defendant, during the People's case-in-chief, defendant's former group commander described "weekly" briefings that younger airmen (under 26) had to take to emphasize the dangers of drinking and driving, and the commander identified defendant's signature on an attendance log from one of those briefings.  But what is not mentioned by appellate counsel is the details about the frequency

13

of the training defendant revealed to Officer Swift.  Defendant said he had had hundreds of briefings and the Air Force taught young airmen to have a "plan" while going out because getting a DUI was a career-ending event.  From all of the evidence the jury could find defendant was more aware of the dangers than the average person.  The fact a defendant received instruction on the dangers of drunk driving is relevant to show his knowledge of the dangers; "persistence" in driving drunk with that knowledge tends to show "a conscious disregard for the lives of others on the road." (People v. Ortiz (2003) 109 Cal.App.4th 104, 111-112; see People v. Murray (1990) 225 Cal.App.3d 734, 744-745 (Murray ) .)

Defendant argues that because of public awareness campaigns, "everybody knows the dangers of driving under the influence."  We disagree.  A general understanding of the danger is not the same as explicit warnings and training about drunk driving.  And although much progress has been made, it is abundantly clear that a large segment of the driving public is not convinced that drunk driving is dangerous.  Even defendant, who had been trained, had a habit of driving "way more" drunk than he was that night, showing that the lessons had not been learned.

The fact defendant had no collisions or near misses does not preclude a Watson murder conviction, although that is frequently one way a prosecutor will try to show a defendant's subjective awareness of the risk.  [Citations.]  Prior crashes or near misses may serve to provide a warning to any reasonable driver that her or his ability is impaired.  But here, defendant was explicitly warned by the cab driver.  Thus, the absence of prior crashes or near misses does not preclude a finding of malice, it merely shows defendant had been able to control his truck, early in the morning when traffic is light, before he killed Officer Redding.  Indeed, he told Officer Swift that he thought he was "fine" and had a "straight freeway shot" up Highway 65, which he drove many times, and drove much drunker than on the night in question.  That defendant was experienced driving while drunk, and did not immediately have a collision or near-miss that night, does not exonerate him.

The cab driver testified that he told defendant he was too drunk to drive "a couple of times."  Then he testified he told defendant he did not know what he was doing and needed to sleep; "You don't want to be driving, and, you know.  I just assumed he knew he was drunk.  I didn't need to tell him that, but I might have."  He then testified he told defendant he (defendant) did not know his "ass from a hole in the ground."  Defendant contests whether the cab driver really told defendant that he thought defendant was drunk, in explicit terms.  But viewing the testimony in the light favorable to the verdict, the jury could find that the cab driver brought home to defendant the fact that in his opinion defendant was not able to drive due to his intoxication, despite the fact that the cab driver could not remember the exact words he used to make his point.

14

Another fact to consider is that defendant had already hired the cab and paid with a credit card. He could have taken the cab all the way home or slept in his truck. He had alternatives to driving, but chose to drive while drunk. (See Watson, supra, 30 Cal.3d at pp. 300-301 [knowing consumption of alcohol when one expects to have to drive " 'reasonably may be held to exhibit a conscious disregard of the safety of others' "].)

While in some cases liability may be shown in part by speeding, here, although defendant was traveling at a speed that would normally be lawful on Highway 65, he admitted in pretrial statements that he was driving by peripheral vision while he was texting a message. Driving at highway speed without looking at the road is driving too fast for conditions, i.e., speeding.

Two other facts could have been found by the jury: First, defendant did not stop, although he eventually said he knew he had hit a person, but instead drove off the highway to avoid the police. Second, defendant lied about how much he had to drink and about whether he knew he had hit a person. These facts could be used to show his consciousness of guilt, as the jury was instructed in this case. (CAL CRIM Nos. 362, 372.) (CT 492-493) (See, e.g., People v. Rios (2007) 151 Cal.App.4th 1154, 1158-1159; People v. Anderson (1994) 26 Cal.App.4th 1241, 1253.)

Defendant states he "has found no case in which such moderate facts have been found sufficient to support a conviction of second degree murder." (AOB 18) This claim is made plausible only because defendant shades the facts to present them benignly. For example, he states Officer Redding was not wearing a reflective vest. But the evidence showed he was 6'2" tall, standing upright facing traffic and motioning with his flashlight in a well lit area, and another driver had no trouble seeing him.

Defendant claims the "warning" of the roadblock was solely the lights on Officer Redding's car, but this ignores the 8 to 12 cars, with flashing light bars, just ahead.

Finally, relying on a snippet of an opinion taken out of context, defendant asserts that drunk-driving murder as articulated in Watson, supra, 30 Cal.3d is "judicially created" and therefore "blur[s] the important distinction between application of the Legislature's specific prohibition of vehicular manslaughter with gross negligence and the generic prohibition of second degree murder with implied malice by allowing a case which belongs firmly in the former category to be drawn into the latter category." He reasons that we have "the critical duty of gatekeeper to assure vehicular manslaughter cases to not get distorted into second degree murder cases."

/////

Defendant leads this claim with a passage in a Court of Appeal opinion that noted, "The <u>Watson</u> decision was significant because it extended the possibility of a second degree murder consequence to a person driving under the influence of alcohol under certain circumstances." (<u>People v. White</u> (1992) 4 Cal.App.4th 1299, 1304.)  This statement was not a holding that <u>Watson</u> departed from the statutory scheme created by the Legislature, rather than merely interpreting that scheme.  Nor would it authorize us to depart from <u>Watson</u>, which rejected the claim that gross vehicular manslaughter is a more specific statute than murder and therefore precludes drunk-driving murder cases.  (<u>Watson</u>, <u>supra</u>, 30 Cal.3d at p. 294.)  We are bound to follow <u>Watson</u>.  (<u>Auto Equity Sales, Inc. v. Superior Court</u> (1962) 57 Cal.2d 450, 455.)  Nor are we persuaded by defendant's citation to a case where the justices disagreed on the extent or viability of second-degree felony murder, a case in which none of the opinions cite <u>Watson</u>.  (<u>People v. Robertson</u> (2004) 34 Cal.4th 156.)  From that case, and his view that drunk-driving murder is judicially created, defendant reasons we must exercise special "judicial restraint" in this case.

We agree that we have an important "gatekeeper" role.  Our role is to determine if substantial evidence supports the murder charge based on factors established by the Legislature and interpreted by the California Supreme Court.

We conclude the jury could rationally find from the evidence at trial that defendant acted with implied malice when he killed Officer Redding.

(Lod. Doc. 8 at 10-17.)

C.   <u>Applicable Legal Standard</u>

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under <u>Jackson</u> is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"  <u>Chein v. Shumsky</u>, 373 F.3d 978, 982 (9th Cir. 2004) (quoting <u>Jackson</u>, 443 U.S. at 318).

1    In conducting habeas review of a claim of insufficient evidence, "all evidence

2    must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d

3    1112, 1115 (9th Cir. 2011). "A petitioner for a federal writ of habeas corpus faces a heavy

4    burden when challenging the sufficiency of the evidence used to obtain a state conviction on

5    federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to

6    grant the writ, the federal habeas court must find that the decision of the state court reflected an

7    objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo, 651

8    F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13. The federal habeas court determines sufficiency

9    of the evidence in reference to the substantive elements of the criminal offense as defined by

10   state law. Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

11       D.   Analysis

12       After reviewing the state court record in the light most favorable to the guilty

13   verdict on the second degree murder charge, including the DVDs of petitioner's interrogation by

14   Officer Swift, the court concludes that there was sufficient evidence introduced at petitioner's

15   trial from which a rational trier of fact could have found beyond a reasonable doubt that

16   petitioner committed second degree murder on a theory of implied malice, as set forth in the

17   Watson decision. The evidence introduced at petitioner's trial reflect that: he had been drinking

18   all night; he was warned by the taxi cab driver that he was unable to drive; he was text messaging

19   while driving and was therefore not devoting his full attention to the road; he knew that his blood

20   alcohol level might well be over the legal limit, and; he had attended detailed seminars on the

21   dangers of driving while intoxicated but ignored those warnings by driving drunk on the night of

22   the homicide and was well as previously. This evidence fully support the jury's verdict that

23   petitioner harbored implied malice when he decided to drive home, knowing he was intoxicated,

24   and then sent text messages while driving under the influence of alcohol. In this regard, this

25   court agrees with the conclusion of the state appellate court that petitioner's actions demonstrated

26   /////

17

both a "wanton disregard for life" and "a subjective awareness of the risk created." Lod. Doc. 8

at 11. See also Jaime v. Tilton, No. 2:05-cv-0933-JKS (HC), 2007 WL 4239504, *8-9 (E.D. Cal.

Nov. 30, 2007) (on habeas review rejecting insufficiency of the evidence challenge to second

degree murder conviction where evidence reflected that petitioner had prior drunk driving

convictions, attended and completed an alcohol education class where the risks of drinking and

driving were taught, took his mother's car without permission and drove he and his friends to a

wedding where he drank enough to have a blood-alcohol level of approximately .16 to.20,

despite some evidence that although he felt able to drive, he asked his companions whether he

should and was elected to drive because he was the most capable of doing so).

It is true, as petitioner argues, that not all persons who accidentally kill another

while driving under the influence are charged with and convicted of second degree murder.

However, for the reasons stated above, the evidence presented at the trial of this particular case

was sufficient to support the jury's verdict.  Moreover, the state courts' denial of relief with

respect to petitioner's insufficiency of the evidence arguments was not an objectively

unreasonable application of the decisions in Jackson and Winship to the facts of this case.

Accordingly, petitioner is not entitled to federal habeas relief.[5]

E.  Request for Evidentiary Hearing

As noted above, petitioner seeks an evidentiary hearing with respect to his

insufficiency of the evidence claim.  (Traverse at 13-14.)  In this regard, it appears that petitioner

---

[5] Petitioner complains that the California Court of Appeal's decision relied on facts obtained from the DVDs of petitioner's police interrogation, or a transcript thereof, despite the fact that his appellate counsel did not have a copy of these DVDs.  Petitioner contends that this situation was unfair and violated his right to due process.  However, whether or not petitioner's appellate counsel obtained the DVDs of petitioner's interrogation by police has no bearing on whether the evidence introduced at trial supported his conviction for second degree murder.  The DVDs were played for the jury and comprised part of the evidence in support of the jury's verdict.  Further, although the DVDs are somewhat difficult to hear because of the presence of background noise, this court was able to follow the questioning and finds that the description thereof set forth in the opinion of the California Court of Appeal with respect to petitioner's interrogation were fairly supported by the record before the state court.

1   wishes to obtain a copy of the DVDs, or a transcript thereof, reflecting Officer Charles Swift's

2   interview of petitioner on October 9, 2005.  As described above, petitioner complains that his

3   appellate counsel did not receive these DVDs and therefore did not review them in connection

4   with his appeal from his conviction.  (Id.)  Petitioner asserts that an evidentiary hearing will "give

5   a chance to Petitioner to have appointed counsel view the DVD, or read [the] transcript, to ensure

6   that it is not being used out of context."  (Id. at 13.)  He also contends that an evidentiary hearing

7   including his receipt of the DVDs, will ensure "a fair hearing."  (Id. at 14.)

8           On September 3, 2010, respondent filed an opposition to petitioner's request for

9   an evidentiary hearing.  (Doc. No. 16.)  On April 25, 2011, respondent filed a supplemental

10  opposition in light of the Supreme Court's recent holding in Cullen v. Pinholster, ___U.S.___,

11  131 S. Ct. 1388 (2011).  (Doc. No. 17.)  On May 26, 2011, petitioner filed a reply in support of

12  his request for an evidentiary hearing.  (Doc. No. 18.)

13          In Pinholster, the Supreme Court held that federal habeas review under 28 U.S.C.

14  § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on

15  the merits."  131 S.Ct. at 1398.  The court explained that its

16          recent decision in Schriro v. Landrigan, 550 U.S. 465, 127 S.Ct.
        1933 (2007), is consistent as well with our holding here.  We
17      explained that "[b]ecause the deferential standards prescribed by §
        2254 control whether to grant habeas relief, a federal court must
18      take into account those standards in deciding whether an
        evidentiary hearing is appropriate."  Id., at 474, 127 S.Ct. 1933.  In
19      practical effect, we went on to note, this means that when the
        state-court record "precludes habeas relief" under the limitations of
20      § 2254(d), a district court is "not required to hold an evidentiary
        hearing."  Id., at 474, 127 S.Ct. 1933 (citing with approval the
21      Ninth Circuit's recognition that "an evidentiary hearing is not
        required on issues that can be resolved by reference to the state
22      court record" (internal quotation marks omitted)).

23  131 S.Ct. at 1399.

24          Here, petitioner's insufficiency of the evidence claim fall under § 2254(d) and

25  must be resolved by reference only to the record that was before the state courts.  With respect to

26  petitioner's concern that he receive a "fair hearing," the undersigned has taken care to ensure that

the full factual record presented to the state court of appeal with respect to petitioner's

insufficiency of the evidence argument, including the DVDs of petitioner's police interview, is

before this court to be properly considered on federal habeas review.  In this regard, by order

dated July 7, 2011, this court directed respondent to lodge the DVDs of petitioner's police

interrogation, reasoning that the DVDs (which were admitted into evidence and shown to the

jury) were necessary to a determination of the merits of petitioner's insufficiency of the evidence

claim.  (Doc. No. 19.)  The DVDs were lodged with this court on July 22, 2011, and have been

reviewed by the court.  Under these circumstances, petitioner is not entitled to an evidentiary

hearing with respect to this claim for federal habeas relief.

III.  Jury Instructions

      A.  Arguments of the Parties

           Petitioner also claims that the trial court erred in instructing the jury at his trial.

Specifically, petitioner contends that the special instruction given to the jury at his trial

concerning the difference between implied malice - an element necessary to the jury's verdict of

second degree murder - and gross negligence, "was misleading when it allowed the term

'wantonness' into the jury instruction without proper explanation.  This [led] jurors to believe

that some of the petitioner's behavior, while perhaps being socially inappropriate, related to the

issue of mental state towards implied malice."  (Pet. at 6.)

           Respondent counters that petitioner has failed to show that this special jury

instruction rendered his trial fundamentally unfair and significantly affected the jury's verdict, as

required for the granting of federal habeas relief.  (Answer at 19-20.)

2.  State Court Opinion

           The state appellate court addressed petitioner's challenge to this special jury

instruction on implied malice as follows:

> The trial court gave the pattern second degree murder instruction,
> CALCRIM No. 520.

/////

"The defendant is charged in Count One with Second Degree Murder, a violation of section 187(a) of the Penal Code.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant committed an act that caused the death of another person;

"AND

"2. When the defendant acted, he had a state of mind called malice aforethought.

"There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

"The defendant acted with express malice if he unlawfully intended to kill.

"The defendant acted with implied malice if:

"1. He intentionally committed an act;

"2. The natural consequences of the act were dangerous to human life;

"3. At the time he acted, he knew his act was dangerous to human life;

"AND

"4. He deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time."

The trial court gave the following special instruction:

"Implied Malice/Gross Negligence

"*The definitions of implied malice, and gross negligence, although bearing a general similarity, are not identical.  Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence.*  An implied malice may be found when the circumstances attending the killing show an abandoned and malignant heart (PC 188), that is, when a defendant,

knowing that his conduct endangers life and with a conscious disregard of the danger, commits an act the natural consequences of which are dangerous to human life.  Gross Negligence as defined in jury instruction 590 requires an objective test, that is, would a reasonable person in the defendant's position have been aware of the risk involved."  (Italics added.)

The language we have italicized is taken almost verbatim from Watson, as follows:

"The requisite culpability for the vehicular manslaughter charged here is gross negligence [citation], which has been defined as the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [Citation.]  On the other hand, malice may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life. [Citations.] *Though these definitions bear a general similarity, they are not identical. Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence."*  (Watson, supra, 30 Cal.3d at p. 296, italics added.)

The trial court also defined natural and probable consequences and the difference between ordinary and gross negligence, as those two concepts pertained to count II, charging gross vehicular manslaughter while intoxicated, and the lesser offense of vehicular manslaughter while intoxicated.  (CALCRIM Nos. 240, 253, 590, 591.)

The jury asked for "a clearer definition" of conscious disregard for human life, and asked for a hypothetical.  The trial court declined the jury's requests.

On appeal defendant contends the special instruction was infirm because it used the term "wantonness," which in his view "is too vague, and because the shorthand definition of implied malice conflicts by its incompleteness with the more complete definition" given in CALCRIM No. 520, also given to the jury, as quoted above.

Taking defendant's last point first, nothing in the special instruction "conflicts" with CALCRIM No. 520.  This is unlike cases where one instruction negates or undermines another instruction, as in the case cited by defendant.  (People v. Maurer (1995) 32 Cal.App.4th 1121, 1125-1127 [one instruction told jury that crime required defendant to be motivated by abnormal sexual interest, but another told jury that motive was not an element].)  The special instruction amplified the pattern instruction.  There is no rule that each instruction must be a complete statement of the law.  (People v. Fiu (2008) 165 Cal.App .4th 360, 370-371 ["absence of an essential

22

element in a given instruction may be supplied by reference to another instruction, or cured in light of the instructions considered as a whole"].)  The jury was instructed it had a duty to correlate all of the instructions.  (CALCRIM No. 200.)  We presume the jury did so.  (See People v. Romo (1975) 47 Cal.App.3d 976, 990; People v. Powell (1960) 186 Cal.App.2d 54, 59.)

As for the claim that the use of the undefined term wantonness was "too vague," we disagree.

"In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys.  The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights.  In making this determination we consider the specific language under challenge and, if necessary, the instructions as a whole."  (People v. Andrade (2000) 85 Cal.App.4th 579, 585.)

Defendant asserts that one meaning of wanton is "lewd" and the jury might have predicated liability on defendant's acts of groping one woman and "dirty dancing" – appellate counsel's term – with another woman earlier that evening.

While "wanton" can refer to sexual or lewd behavior (see Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 1409), the jury could not rationally have so interpreted the term in this case.  The pattern instruction told the jury the act necessary to find murder had to be an act dangerous to human life (CALCRIM No. 520), and so did the special instruction, which in part stated:  "An implied malice may be found when the circumstances attending the killing show an abandoned and malignant heart (PC 188), that is, when a defendant, knowing that his conduct endangers life and with a conscious disregard of the danger, commits an act the natural consequences of which are dangerous to human life."  However "wanton," that is, sexual or lewd, defendant's acts toward women that night were, those acts were not "dangerous to human life."  The jury would not rationally have interpreted the instructions to convict defendant of murder because he groped a woman's breast and "dirty danced" with another woman before he got in his truck and began driving while drunk.  Thus, the ambiguity in the word "wanton" identified by defendant is not one that had any application to the facts of this case.  It was academic.

The fact the jury sought clarification of "conscious disregard" does not indicate that its concerns had anything to do with the use of the term "wantonness."  If the jury had been confused about "wantonness" we presume it would have asked for a definition of that term, rather than asking for a definition of or illustration of "conscious disregard."

/////

23

1    Thus, we reject defendant's claim that by using the term
2    "wantonness" in the special instruction, the trial court somehow
     negated or impaired or confused the other instructions on murder
     and its elements, as applicable in this case.
3

4   (Lod. Doc. 8 at 17-21.)

5          C. Applicable Legal Standard

6          A challenge to jury instructions does not generally state a federal constitutional

7   claim.  Estelle, 502 U.S. at 72; Engle v. Isaac, 456 U.S. 107, 119 (1982); Gutierrez v. Griggs, 695

8   F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury

9   instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but

10  must violate some due process right guaranteed by the fourteenth amendment."  Cupp v.

11  Naughten, 414 U.S. 141, 146 (1973).  To prevail on such a claim petitioner must demonstrate

12  "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due

13  process.'"  Prantil v. State of Cal., 843 F.2d 314, 317 (9th Cir. 1988) (quoting Darnell v. Swinney,

14  823 F.2d 299, 301 (9th Cir. 1987)).  See also Chambers v. McDaniel, 549 F.3d 1191, 1199 (9th

15  Cir. 2008).  In making its determination, this court must evaluate the challenged jury instructions

16  "'in the context of the overall charge to the jury as a component of the entire trial process.'"

17  Prantil, 843 F.2d at 317 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  See also

18  Chambers, 549 F.3d at 1199.

19         D. Discussion

20         Here, petitioner fails to state a cognizable claim for federal habeas relief, since he

21  cannot show that the giving of the special instruction so infected his trial with unfairness as to rise

22  to the level of a due process violation.  First, this court notes that the challenged instruction

23  appears to be a correct statement of California law.  See Henderson v. Kibbe, 431 U.S. 145, 155

24  (1977) (party claiming instructional error on federal habeas review based upon an allegedly

25  incomplete instruction, rather than an erroneous instruction, has an "especially heavy burden").

26  As the California Court of Appeal observed, the language of the challenged instruction closely

                                        24

1    tracked that of the decision in Watson, which also included the term "wantonness" which

2    petitioner disputes here.

3              Furthermore, any confusion created by the trial court's use of this term was

4    dispelled by the remainder of the special instruction and/or the related instruction on murder with

5    malice aforethought, CALCRIM 520.  Petitioner's claim that jurors might have been misled into

6    finding his arguably lewd behavior in the hours before the crash to constitute the "wantonness"

7    required for implied malice, is unpersuasive in light of the context provided by the remainder of

8    the challenged jury instruction, which stated in part:

9              An implied malice may be found when the circumstances attending
                 the killing show an abandoned and malignant heart (PC 188), that
10             is, when a defendant, knowing that his conduct endangers life and
                 with a conscious disregard of the danger, commits an act the natural
11             consequences of which are dangerous to human life.

12   (CT 498.)  Similarly, through the giving of CALCRIM No. 520 the jury was informed that one

13   acts with implied malice if the natural consequences of his act were dangerous to human life, and

14   at the time he acted, he knew his act was dangerous to human life.  (CT 495.)  Given this context

15   and the jury instructions as a whole, any jurors unsure as to the meaning of "wantonness" would

16   have understood at least this much:  It concerned defendant's state of mind at the time of his

17   driving while intoxicated and had nothing to do with any arguably lewd behavior in the hours

18   prior thereto.  Thus, petitioner has not shown that challenged instruction violated his right to due

19   process.  See Howard v. Campbell, No. Civ S-04-2414 FCD KJM P, 2007 WL 2601418 at *6-7,

20   E.D. Cal. Sept. 6, 2007) (rejecting federal habeas challenge to jury instructions on second degree

21   murder and vehicular manslaughter and noting that any confusion arguably created by the

22   instructions given was dispelled by the other instructions given by the trial court).

23   III.  Petitioner's Motion for "Chain of Custody" and for the Appointment of Counsel

24             On July 29, 2011, petitioner filed a request for the appointment of counsel, and for

25   "the chain of custody for DVD evidence."  (Doc. No. 23.)  Petitioner requests that the court

26   ascertain the "chain of custody" of the DVDs of his police interrogation "due to the reappearance

1    and disappearance of the DVD from the Appell[ate] Record, and the apparent confusion over it's

2    current location." (Id.) Petitioner asserts that "the chain of custody is needed to ensure that it has

3    not in any way been compromised due to it's most recent departure." (Id.) Petitioner's request in

4    this regard will be denied.  There is nothing in the record suggesting that the DVDs of petitioner's

5    police interview lodged with this court are not authentic, that there was any confusion over their

6    location, or that they have been tampered with in any way.  As discussed above, the facts set forth

7    in the decision of the California Court of Appeal are fully consistent with the contents of those

8    DVDs as lodged.

9          The court will also deny petitioner's request for counsel.  There currently exists no

10   absolute right to appointment of counsel in habeas proceedings.  See Nevius v. Sumner, 105 F.3d

11   453, 460 (9th Cir. 1996). Title 18 U.S.C. § 3006A authorizes the appointment of counsel at any

12   stage of the case "if the interests of justice so require."  See Rule 8(c), Fed. R. Governing § 2254

13   Cases.  However, in light of the analysis set forth above with respect to the merits of petitioner's

14   federal habeas  claims the court does not find that the interests of justice would be served by the

15   appointment of counsel.

16                                    CONCLUSION

17          Accordingly, IT IS HEREBY ORDERED that:

18          1.  Petitioner's application for a writ of habeas corpus is denied[6];

19          2.  Petitioner's request for an evidentiary hearing with respect to Claim 1 is denied;

20          3.  A certificate of appealability is issued as to petitioner's claim that the evidence

21   introduced at his trial was insufficient to support his conviction on the second-degree murder

22   charge (see Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or

23   deny a certificate of appealability when it enters a final order adverse to the applicant)); and

24   ─────────────────────

25        [6]  As noted above, Claim 2 of the application for federal habeas relief is dismissed due to
     petitioner's conceded failure to exhaust that claim in state court and pursuant to his request that
26   the court "instead rule on the other claims."  (Traverse at 14.)

1        4.  Petitioner's July 29, 2011 "Request for the Chain of Custody for DVD

2   Evidence" and for the appointment of counsel (Doc. No. 34) is denied.

3   DATED: November 21, 2011.

4

5   _____

6   DALE A. DROZD
    UNITED STATES MAGISTRATE JUDGE

7   DAD:3/8
    dung1191.hc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26